IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL NO. 3:07CV368-C

| | |
|---|---|
| JOSEPH PIERSON, )<br>      Plaintiff, )<br>               )<br>      vs. )<br>                )<br>MICHAEL J. ASTRUE, )<br>Commissioner of Social )<br>Security Administration, )<br>      Defendant. )<br>               ) | **MEMORANDUM AND RECOMMENDATION** |

**THIS MATTER** is before the Court on the Plaintiff's "Motion for Summary Judgment" and "Brief Supporting ... " (both document #16) filed March 14, 2008; and the Defendant's "Motion For Summary Judgment" (document #17) and "Memorandum in Support of the Commissioner's Decision" (document #18), both filed May 12, 2008. This case has been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B), and these motions are now ripe for disposition.

Having considered the written arguments, administrative record, and applicable authority, the undersigned will respectfully recommend that Plaintiff's Motion for Summary Judgment be denied; that Defendant's Motion for Summary Judgment be granted; and that the Commissioner's decision be affirmed.

**I. PROCEDURAL HISTORY**

On October 24, 2003, the Plaintiff filed an application for a period of disability and Social Security disability benefits ("DIB"), alleging he was unable to work as of August 18, 2003, as the result of advanced diabetic peripheral sensory neuropathy. (Tr. 44, 61.) The Plaintiff's claim was

denied initially and upon reconsideration.

The Plaintiff filed a timely Request for Hearing, and on May 16, 2006 a hearing was held before an Administrative Law Judge ("ALJ"). In a decision dated June 1, 2006, the ALJ denied Plaintiff's claim, and by notice dated June 29, 2007, the Appeals Council denied his request for further administrative review.

The Plaintiff filed the present action on August 31, 2007, and the parties' cross-motions for summary judgment are ripe for disposition.

## II. FACTUAL BACKGROUND

In his brief, the Plaintiff expressly "adopts and incorporates ... the summary of the facts as stated by the ALJ." See Plaintiff's "Brief Supporting ... " at 3 (document #16). The Commissioner has also adopted the ALJ's recitation of the facts. Moreover, the undersigned has carefully reviewed the record and finds that the ALJ's recitation of the facts, including the Plaintiff's medical records, is accurate. Accordingly, the undersigned adopts the ALJ's statement of the facts, as follows:

> The claimant is a 44 year old individual and is therefore in the "younger individual" age category. He has a high school education with additional training as a paramedic. His past relevant work was as a paramedic. A review of the claimant's earnings records reveal that the claimant earned sufficient quarters of coverage to remain insured at least through the date of this decision. He has not engaged in substantial gainful activity since his alleged onset date.
>
> The claimant alleges that he is unable to work in any capacity due to diabetes mellitus which has resulted in foot problems and subsequent amputation of his right big toe. The claimant stated that due to his diabetic neuropathy, he developed ulcers on his feet, numbness, and balance problems. The ulcers became infected and due to the loss of pain sensation, his big right toe became infected and was subsequently amputated. He experiences swelling of his feet and standing causes pressure on his feet. After sitting 20 minutes, he will experience pressure and burning in his feet and he will have to change position, massage his feet or walk around. He also experiences pain in his feet while standing and can only stand 10 to 15 minutes. Due to the pain and

burning sensation in his feet, he estimated that he has two days a week when he stays completely off of his feet and uses ice and massages to help with pain relief. In additional to his diabetes mellitus, he has been diagnosed with carpal tunnel syndrome and has some loss of sensation of his hands and frequent[ly] drops things. When his sugar level is high, this worsens the symptoms in his hands and feet. He stated that when his sugar level is measure[d] 160, he is unable to walk and if it goes down to 80, he becomes dizzy. The claimant also stated that since he stopped work he has noticed changes in his mood, loses his temper easily, has crying spells and is easily frustrated.

With respect to his daily activities, the claimant testified that he his able to take care of his personal needs. He spends at least an hour a day on foot maintenance and doing foot exercises. Daily he drives his wife to work and takes the kids to school, a total of two miles. Occasionally, he uses the computer to go on the internet and E-bay but has no formal typing skills and can only sit for approximately 10 minutes. He no longer attends church and paces his housework into 15 to 20 minutes segments. He uses a riding lawnmower and does take his family on "get-a-way" weekends.

Medical evidence of record establishes that the claimant was followed at the Davidson Clinic from January 2001 for diabetes. The claimant's history included a hospitalization in July 2002 for cellulitis of his right foot. In August 2003, the claimant reported that he developed a fissure on his right toe three weeks earlier that had continued to worsen. He also stated that his blood sugar had been under good control. An antibiotic was prescribed. In January 2004, his treating physician, Dr. Ron T. Beamon, stated that the claimant had diabetes, peripheral neuropathy and was status post amputation of his right great toe. Due to the claimant's peripheral neuropathy, he lacked sensation in both feet, making it difficult for him to be able to determine if he has suffered any trauma to his feet. Dr. Beamon stated that because of his neuropathy, any type of occupation which required the claimant to stand or do a lot of walking was not recommended. The doctor went on to say that the claimant's diabetes was currently under good control; however, the peripheral neuropathy was not reversible and his prognosis was poor. It was Dr. Beamon's opinion that the claimant be placed on disability. (Exhibits 2F and 3F)

The claimant was also being followed at Foot & Ankle Associates by Dr. K. Bloom for problems with his feet. In August 2003, the claimant reported a sore right great toe. The impression was of a neurotrophic Wagner grade II-III ulceration right hallux with cellulitis. He was encouraged to take off work for three days and to wear a special sandal to promote healing of his toe. A MRI was positive for osteomyelitis of the right great toe and the claimant was hospitalized for primary partial amputation of his right toe. Follow up records show that the claimant progressed well after the amputation with no gross evidence of acute infection. In October 2003, the claimant was informed that he could begin wearing running shoes. When seen in January 2004 the

claimant reported that he was not steady on his feet and that he had right foot pain and swelling. After an examination, Dr. Bloom stated that the claimant may have plantar fasciitis and he should stay out of work until March 1, 2004. However, when the claimant was seen in February 2004, he reported that he was "doing great." He felt that the stretching exercises were benefiting him as well as some over-the-counter inserts which he was using. The impression was of clinically resolving plantar fasciitis. He was released to return in four to six months for a diabetic foot check. (Exhibits 4F, 5F, and 6F)

In a letter to the State of North Carolina Retirement Systems Division in October 2003, Dr. Bloom summarized the claimant's treatment regarding his toe amputation. He noted that while the claimant's amputation site was fully healed, he felt the claimant was at a great risk for further breakdown due to his advanced sensory neuropathy. He explained that he insisted the claimant stop his job as a paramedic and did not wish for him to do any job that involved any standing or weight-bearing activity as it would be detrimental to his condition and probably result in future pedal ulceration, breakdown and possible amputation. (Exhibit 9F)

The claimant underwent a consultative evaluation by Dr. Warren J. Steinmuller in April 2004. The claimant reported that since he had to leave his job due to the amputation of his toe, he has felt sad, "down" and depressed. He stated that he was frustrated, more irritable, had pain in his feet which interfered with his sleep, had gained weight due to being less active, had problems with concentration and focus, was apathetic, and has less interest and motivation in doing things. The claimant noted that he "makes it through the day" by keeping himself occupied by going to the library or running various errands until his son comes home from pre-school. He will then spend time with his son. The claimant also reported that he does most of the chores at home including food shopping, meal preparation, laundry, housecleaning, and managing the finances. He stated that he had not received any treatment for depression and did not feel like he needed any. Cognitive examination revealed that he followed the two-step sequence without difficulty, there were no problems with his immediate or remote memory and performed serial testing quickly but with one error. There was no evidence to suggest difficulties with managing funds. The impression was of major depression secondary to diabetes, diabetic peripheral neuropathy and toe amputation. (Exhibit 7F)

In April 2004, the claimant underwent a consultative examination by Dr. Carl T. Augustus. He reported severe discomfort of his right foot with swelling especially when sitting for more than 15 minutes and paresthesias with pain when taking his first steps in the morning. Examination showed normal gait and station with some difficulties standing on toes owing to the amputation. There was decreased vibratory sense in the lower extremity. The impression was of plantar fasciitis based on his historic evidence which could be treated with the combination of corticosteroid

injection and a shoe insert and diabetic neuropathy found on examination due to his underlying diabetes. (Exhibit 8F)

Records from Dr. Gina G. LiCause show that in September 2004, at his routine physical, the claimant's review of symptoms was significant for numbness of the hands, but that he had no other complaints. He reported that his blood sugar ranged from 110 to 130. Examination was within normal limits and overall stable but with signs of neuropathy in stocking glove distribution. When seen again for a routine physical in September 2005, the claimant complained of pain in his lower back and a problem with chronic insomnia. Examination showed full range of motion of all extremities with no swelling or tenderness. Gait was normal but there was no sensation to the monofilament on the feet. In December 2005, Dr. LiCause stated that the claimant has Charcot joints and cannot sit or stand or walk for more than 30 minutes at a time and as he has no feeling in his feet, his balance is not secure. (Exhibit 1 OF)

The claimant was evaluated by Dr. Stephanie Sittler in May 2005 for numbness of his hands and feet. General sensory examination revealed decreased in sensation to just below his knee and the distal forearm in the upper extremities. Nerve conduction studies showed evidence of a moderate sensory motor neuropathy in the lower extremities and mild to moderate carpal tunnel syndrome in the upper extremities. He was prescribed wrists splints and it was recommended that he try some Axsain cream for his lower extremities. (Exhibit 14F)

The claimant was seen by Dr. Stacy Le in January 2006 for purposes of establishing a new treating physician. His medical history was reiterated and he noted that his neuropathy was very problematic in that he cannot feel the bottom of his feet and it causes him to have somewhat of a loss of balance. The overall assessment was of diabetes mellitus with neuropathy and retinopathy. He was counseled on all appropriate health maintenance issues. (Exhibit 16F) ...

In summary, the medical evidence establishes that the claimant has diabetes mellitus with peripheral neuropathy and subsequent amputation of his right great toe. It is recognized that the claimant would have a period of time when he would be unable to work before his amputation and during his convalescence period. However, by February 2004, within five months of his amputation, the claimant stated that he was "doing great." Further, the records show that the claimant's blood sugar levels are under control the majority of the time. Even though the claimant may have some balance problems and difficulty standing for long periods of time due to his amputation of his toe, examinations have shown that the claimant's amputation site was completely healed and none of the claimant's doctor have found his balance problems significant enough to prescribe a cane for everyday use. Although it was determined by Dr. Bloom, his foot specialist, that the claimant should not do any job that involved

standing or weight bearing activity, Dr. Bloom did not state that the claimant was totally disabled from all work. The record also shows that the nerve conduction studies showed that the claimant has mild to moderate bilaterally carpal tunnel syndrome. However, no surgery was suggested and the claimant was given wrist splints to wear at night. Further, this condition does not stop the claimant from doing household tasks such as washing the dishes and using the computer. The claimant has been seen by numerous doctors and they all are in consensus that he should do no prolonged walking or standing given the history of problems with his feet. However, it is clear from the record that these doctors may not be aware of the claimant's own statements regarding his very active lifestyle. The claimant testified that he drove his wife to work and takes his children to school daily, does the majority of the housework, including the dishes, laundry, and all of the meal preparation. He manages the family finances, does the grocery shopping, and mows the lawn. He uses the computer to go on the internet and to search E-Bay. He takes his family on "get-away" weekends, does a variety of errands and goes to the library....

The undersigned has evaluated the claimant's mental condition in accordance with the revised Listings of Mental Impairments that became effective on September 20, 2000. The evidence shows that the consultative psychiatrist, Dr. Stienmuller, diagnosed the claimant with major depression. However, the claimant has repeatedly denied being depressed and has sought no treatment. There is no indication in the record that any of his doctors have suggested that he take an anti-depressant medication. He has admitted to bouts of reduced concentration and focus, such as losing track of what he was doing, and difficulty sleeping which he attributes to the pain from the neuropathy in his feet. Cognitive testing was within normal limits and he followed the two-step sequence without difficulty. He performed the serial testing quickly with only one error and there was no indication that the claimant could not manage his finances....

The state agency physicians concluded that the claimant can sit, stand, or walk for about six hours in a work day, can lift and carry 20 pounds occasionally and 10 pounds frequently....

Vocational expert Beverly Carlton testified that with a residual functional capacity for "light" and "sedentary" work with a sit/stand option and no significant climbing, balancing, or exposure to unprotected heights or hazards, no repetitive fine dexterity of the hands and pain would rule out sustained, skilled concentration, there are a significant number of other jobs existing in the national economy which the claimant can perform. As examples she cited calendar control clerk jobs (1,250 unskilled, light jobs in North Carolina, 40,693 nationwide); ticket seller jobs (5,385 unskilled, light jobs in North Carolina, 173,100 nationwide); and data examination clerk jobs (1,480 unskilled, sedentary jobs in North Carolina, 15,210 nationwide). Additionally, Ms. Carlton testified that the description of these jobs is consistent with their description in the <u>Dictionary of Occupational Titles</u>.

(Tr. 16-22).

The ALJ considered the above-recited evidence and determined that the Plaintiff was not "disabled" for Social Security purposes.

### III. STANDARD OF REVIEW

The Social Security Act, 42 U.S.C. § 405(g) and § 1383(c)(3), limits this Court's review of a final decision of the Commissioner to: (1) whether substantial evidence supports the Commissioner's decision, Richardson v. Perales, 402 U.S. 389, 390, 401 (1971); and (2) whether the Commissioner applied the correct legal standards. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); see also Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (per curiam). The district court does not review a final decision of the Commissioner de novo. Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir. 1986); King v. Califano, 599 F.2d 597, 599 (4th Cir. 1979); Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

As the Social Security Act provides, "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). In Smith v. Heckler, 782 F.2d 1176, 1179 (4th Cir. 1986), quoting Richardson v. Perales, 402 U.S. 389, 401 (1971), the Fourth Circuit defined "substantial evidence" thus:

> Substantial evidence has been defined as being "more than a scintilla and do[ing] more than creat[ing] a suspicion of the existence of a fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

See also Seacrist v. Weinberger, 538 F.2d 1054, 1056-57 (4th Cir. 1976) ("We note that it is the responsibility of the [Commissioner] and not the courts to reconcile inconsistencies in the medical evidence").

The Fourth Circuit has long emphasized that it is not for a reviewing court to re-weigh the evidence, nor to substitute its judgment for that of the Commissioner, assuming the Commissioner's final decision is supported by substantial evidence. Hays v. Sullivan, 907 F.2d at 1456 (4th Cir. 1990); see also Smith v. Schweiker, 795 F.2d at 345; and Blalock v. Richardson, 483 F.2d at 775. Indeed, this is true even if the reviewing court disagrees with the outcome – so long as there is "substantial evidence" in the record to support the final decision below. Lester v. Schweiker, 683 F.2d 838, 841 (4th Cir. 1982).

## IV. **DISCUSSION OF CLAIM**

The question before the ALJ was whether at any time the Plaintiff became "disabled" as that term of art is defined for Social Security purposes.[1] The ALJ considered the above-recited evidence and found after the hearing that the Plaintiff had not engaged in substantial gainful activity at any time relevant to his decision; that the Plaintiff's "diabetes mellitus with neuropathy, status post right great toe amputation, carpal tunnel syndrome, and depression" were severe impairments; but that Plaintiff's impairments or combination of impairments did not meet or equal the criteria of any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4 (a.k.a. "the Listings"); that the Plaintiff's depression causes mild limitations in activities of daily living, in social functioning, and in concentration, persistence, or pace; that the Plaintiff has not experienced any extended episodes of decompensation; that Plaintiff could no longer perform his past relevant work; that the Plaintiff

---

[1]Under the Social Security Act, 42 U.S.C. § 301, et seq., the term "disability" is defined as an:

inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . .

Pass v. Chater, 65 F. 3d 1200, 1203 (4th Cir. 1995).

was a "younger individual" with a high school education; and that the Plaintiff retained the residual functional capacity to perform light[2] work with a sit/stand option, no significant climbing, balancing, or exposure to unprotected heights or hazards, no repetitive fine dexterity of the hands, and no sustained, skilled concentration.

After noting correctly that Medical-Vocational Rules 202.21 would require a finding of "not disabled" for a person of comparable age and education who could perform a "full range" of light work, the ALJ then shifted the burden to the Secretary to show the existence of other jobs in the national economy which the Plaintiff could perform. The VE's testimony, stated above and based on a hypothetical that factored in the limitations discussed above, provided substantial evidence that there were a significant number of jobs in the national economy that the Plaintiff could perform, and, therefore, that the Plaintiff was not disabled.

The Plaintiff appeals only the ALJ's determinations that his diabetic neuropathy did not meet Listing 9.08A, discussed below, and that the purported opinions of Dr. Beamon, Dr. Bloom, and Dr. Augustus were not entitled to "controlling weight." See Plaintiff's "Brief Supporting ... " at 3-5 (document #16). However, the undersigned finds that there is substantial evidence supporting the ALJ's findings concerning the Plaintiff's impairments and his doctors' opinions, as well as the ALJ's

---

[2]"Light" work is defined in 20 C.F.R. § 404.1567(b) as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

9

ultimate determination that the Plaintiff retained sufficient residual functional capacity ("RFC")[3] to mandate a finding of nondisability.

Listing 9.08 requires that the Plaintiff prove that he suffers from diabetes mellitus with neuropathy demonstrated by "significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements, or gait and station" consistent with § 11.00C of Appendix 1. See 20 C.F.R. Part 404, Subpart P, Appendix 1, § 9.08A. There must be a persistent disorganization of motor function, and the assessment of impairment depends upon the degree of interference with locomotion and/or use of arms, hands and fingers. See 20 C.F.R. Part 404, Subpart P, Appendix 1, § 11.00C. As the ALJ correctly concluded, the evidence of record shows that Plaintiff suffers from neuropathy as a result of his diabetes mellitus but does not show that it results in persistent disorganization of Plaintiff's ability to walk or to use his arms, hands or fingers.

The Plaintiff contends that statements by Drs. Beamon (Tr. 139), LiCause (Tr. 214), DuBois (Tr. 231-232), Bloom (Tr. 225-226, 266-267) and Augustus (Tr. 204) show that he meets Listing 9.08A. The Plaintiff cites their statements but does not argue or explain how they prove that he meets the Listing in question. As discussed in more detail below, these reports indicate that the Plaintiff has diabetic neuropathy in his feet, which the ALJ incorporated into his formulation of the Plaintiff's RFC. Although these reports indicate that the Plaintiff is a risk for further foot infections, they do not show the significant and persistent disorganization of motor function in two extremities

---

[3] The Social Security Regulations define "residual functional capacity" as "what [a claimant] can still do despite his limitations." 20 C.F.R. § 404.1545(a). The Commissioner is required to "first assess the nature and extent of [the claimant's] physical limitations and then determine [the claimant's] residual functional capacity for work activity on a regular and continuing basis." 20 C.F.R. § 404.1545(b).

10

resulting in sustained disturbance of gross and dexterous movements, or gait and station required to meet Listing 9.08A.

In October 2003, about two months after the Plaintiff's right great toe was amputated, Dr. Bloom felt that Plaintiff had fully recovered from the amputation but that there was a risk of further breakdown as a result of his advanced sensory neuropathy. He opined that working at a job that involved standing or weight-bearing "might probably" result in future pedal ulceration that might lead to possible additional amputation. Dr. Bloom, however, did not indicate that Plaintiff had significant and persistent disorganization of motor function or sustained disturbance of gait or station because of his neuropathy.

In January 2004, Alan Reid, Dr. Beamon's Physician Assistant at the Davidson Clinic, wrote a note in which he indicated that because of his neuropathy, Plaintiff lacked sensation in his feet making it difficult to determine if he suffers from a foot trauma and so should not work in a job requiring a lot of standing or walking. Nothing in this statement indicates that Plaintiff had sustained gross disturbance of station or gait. In fact, this statement is consistent with the ALJ's finding that Plaintiff could perform light work with a sit/stand option that did not require significant climbing, balancing or exposure to heights or hazards or repetitive fine hand dexterity, and that could be performed with some mild limitations related to Plaintiff's depression.

On April 1, 2004, the Plaintiff reported at a consultative examination that he did most of the household chores including food shopping, meal preparation, laundry and housecleaning. He also reported managing his own self-care without difficulty.

Later that month, Dr. Augustus examined the Plaintiff, who reported neuropathy in both feet and discomfort and swelling in his right foot after sitting for fifteen minutes. Dr. Augustus noted

11

that his examination of Plaintiff revealed diabetic neuropathy and that Plaintiff reported classic symptoms of plantar fasciitis (inflammation of the sheet of fibrous tissue enclosing the muscles in soles of his feet) that could be treated with injections, shoe inserts and exercise.

Dr. Augustus' examination findings, however, clearly do not support the contention that Plaintiff's neuropathy met Listing 9.08A. Dr. Augustus noted that although Plaintiff had some difficulty standing on his toes because of his amputated great toe, his gait and station were normal. Dr. Augustus also found that Plaintiff had a full range of motion in all of his joints including his ankles and feet.

In May 2005, Dr. DuBois evaluated the numbness and tingling Plaintiff was experiencing in his hands and feet. Plaintiff reported very little sensation below the ankle and some numbness and tingling in his hands over the prior six months making it hard to type. Plaintiff reported that the numbness in his feet was worse with sitting for a prolonged time or being on his feet for a while. Dr. DuBois reported that nerve conduction tests showed moderate sensory motor neuropathy in his legs and mild to moderate carpal tunnel syndrome in both hands.

In December 2005, Dr. LiCause opined that Plaintiff could not sit or stand for more than thirty minutes at a time, which supports the ALJ's inclusion of a sit/stand option in Plaintiff's RFC. He indicated that the neuropathy resulted in a loss of feeling in Plaintiff's feet that could lead to injury or infection because of reduced ability to appreciate pain, but did not indicate that Plaintiff had significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements, or gait and station.

Dr. LiCause's earlier examination reports do not show sustained disturbance of Plaintiff's gross or dexterous movements. When Dr. LiCause examined him in September 2004, the Plaintiff's

only complaint was about numbness in his hands. He reportedly had a regular regimen of exercise. Dr. LiCause reported that Plaintiff had a full range of motion in his upper and lower extremities; adequate and symmetric muscle tone; and full ("5/5") muscle strength in his upper and lower extremities. When examined again by Dr. LiCause in September 2005, Plaintiff was again reported as having a full range of motion in his upper and lower extremities and adequate and symmetric muscle tone. Plaintiff was found to have full muscle strength in his upper and lower extremities.

In a note submitted after the ALJ's decision in this case, Dr. Bloom opined that he believed that Plaintiff "is at high risk for further amputation with any full-time job involving sitting or standing." (Tr. 266.) He explained, however, that this was because the Plaintiff was predisposed to developing neuropathic ulcerations, in other words, that the Plaintiff was at risk for infection. Dr. Bloom did not provide any opinion that Plaintiff's diabetic sensory neuropathy had resulted in significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements, or gait and station.

The Plaintiff also generally complains of the ALJ's "failure to give the Plaintiff's treating physicians' opinions ... controlling weight," document #16 at 4, but does not point to any evidence or offer any argument or rationale supporting this assignment of error. Moreover, the Fourth Circuit has established that a treating physician's opinion need not be afforded controlling weight. Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992). A treating physician's opinion on the nature and severity of the alleged impairment is entitled to controlling weight only if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. See 20 C.F.R. §§ 404.1527(d)(2) (2002); and Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001). Therefore, "[b]y negative implication, if a physician's opinion

13

is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Mastro, 270 F.3d. at 178, citing Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996).

Concerning opinions expressed by Dr. Beamon, and his Physician's Assistant, Mr. Reid, discussed above, the ALJ explained that he had considered those opinions but had given them little weight because they were offered shortly after the amputation of the great toe of Plaintiff's right foot and did not take into account Plaintiff's statements to his foot specialist about his condition, that is, that he was "doing great."

Indeed, Dr. Bloom felt that Plaintiff had fully recovered from the amputation of his great toe on his right foot a couple of months after the operation, and opined only that working at a job that involved standing or weight-bearing might probably result in future pedal ulceration that might lead to possible additional amputation. The ALJ clearly took this risk into account when he limited the Plaintiff to an RFC for light work with a sit/stand option.

As noted above, in April 2004, Dr. Augustus examined Plaintiff and reported classic symptoms of plantar fasciitis which could be treated with injections, shoe inserts and exercise. Dr. Augustus noted that Plaintiff had some difficulty standing on his toes because of his amputated great toe, but that his gait and station were normal and that Plaintiff had a full range of motion in all of his joints including his ankles and feet (Tr. 204, 205).

Additionally, after reviewing Plaintiff's medical records, Dr. Burkhart and Dr. Virgili prepared assessments of Plaintiff's physical functional capacity in December 2003 and April 2004, respectively. They indicated that Plaintiff could lift and carry ten pounds frequently and twenty pounds occasionally and could stand for six hours per day or sit for six hours per day. The ALJ

agreed with these opinions as to Plaintiff's ability to lift and carry but found that the opinions concerning Plaintiff's ability to sit or stand were entitled to diminished weight because of additional evidence that was not available to them at that time. He found that Plaintiff should not be required to stand or sit for prolonged periods and limited him to jobs that allowed a sit/stand option so he could change positions as needed. This limitation is consistent with the opinions of Plaintiff's physicians who had indicated that he should not do work that required ongoing standing or sitting.

In December 2005, Dr. LiCause opined that Plaintiff could not sit or stand for more than thirty minutes at a time. This is consistent with the ALJ's inclusion of a sit/stand option in Plaintiff's RFC.

In short, the ALJ properly weighed the medical evidence and opinions of record. No medical source had indicated that the Plaintiff could not perform the lifting or carrying associated with light work. To the extent that they indicated that Plaintiff could not stand or sit for extended periods, the ALJ took this into account in placing a sit/stand limitation in the Plaintiff's RFC.

The record is also clear that the Plaintiff engaged in significant daily life activities during the subject period, such as taking care of his personal needs and performing most of the household chores including grocery shopping, meal preparation, laundry, and housecleaning. On the relevance of an ability to engage in substantial daily activities to a disability claim, see, e.g., Mickles, 29 F.3d at 921 (plaintiff performed "wide range of house work," which supported finding of non-disability); and Gross, 785 F.2d at 1166 (evidence that plaintiff washed dishes and generally performed household chores supported finding of non-disability).

The ALJ also properly applied the standard for determining a claimant's residual functioning capacity based on subjective complaints of pain and, in this case, the record contains substantial

evidence to support the ALJ's conclusion that Plaintiff's testimony was <u>not</u> fully credible.

The determination of whether a person is disabled by non-exertional pain or other symptoms is a two-step process. "First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." <u>Craig v. Chater</u>, 76 F.3d 585, 594 (4th Cir. 1996), <u>citing</u> 20 C.F.R. § 416.929(b); <u>and</u> § 404.1529(b); 42 U.S.C. § 423(d)(5)(A). If there is such evidence, then the ALJ must evaluate "the intensity and persistence of the claimant's pain, and the extent to which it affects [his] ability to work." <u>Id.</u> at 595, <u>citing</u> 20 C.F.R. § 416.929(c)(1); <u>and</u> § 404.1529(c)(1). The regulations provide that this evaluation must take into account:

> not only the claimant's statements about his or her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings; any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it.

<u>Craig</u>, 76 F.3d at 595 (citations omitted).

The record contains evidence of Plaintiff's "diabetes mellitus with neuropathy, status post right great toe amputation, carpal tunnel syndrome, and depression" – which <u>could</u> be expected to produce some of the pain claimed by Plaintiff – and thus the ALJ essentially found that Plaintiff could satisfy the first prong of the test articulated in <u>Craig</u>. However, the ALJ also correctly evaluated the "intensity and persistence of his pain, and the extent to which it affects his ability to work," and found Plaintiff's subjective description of his limitations not credible.

"The only fair manner to weigh a subjective complaint of pain is to examine how the pain

affects the routine of life." Mickles, 29 F.3d at 921, citing Hunter v. Sullivan, 993 F.2d 31 (4th Cir. 1992) (claimant's failure to fill prescription for painkiller, which itself was indicated for only mild pain, and failure to follow medical and physical therapy regimen, supported ALJ's inference that claimant's pain was not as severe as he asserted). In this case, the record before the ALJ clearly established an inconsistency between the Plaintiff's claims of inability to work and his objective ability to carry on a moderate level of daily activities, as well as the objective medical record discussed above.

Although the medical records establish that the Plaintiff experienced pain and mental and emotional difficulties to some extent or degree, as the Fourth Circuit has noted, it is the ALJ's responsibility, not the Court's, "to reconcile inconsistencies in the medical evidence." Seacrist v. Weinberger, 538 F.2d 1054, 1056-57 (4th Cir. 1976). Moreover, the facts noted by the ALJ clearly support the ultimate conclusion that Plaintiff suffered from, but was not disabled from working, by his combination of impairments.

Simply put, "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Secretary (or the Secretary's designate, the ALJ)." Mickles v. Shalala, 29 F.3d 918, 923 (4th Cir. 1994), citing Simmons v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987). This is precisely such a case, as it contains substantial evidence to support the ALJ's treatment of the medical records and ultimate determination that the Plaintiff was not disabled.

## V. RECOMMENDATIONS

**FOR THE FOREGOING REASONS,** the undersigned respectfully recommends that Plaintiff's "Motion for Summary Judgment" (document #16) be **DENIED;** that Defendant's "Motion for Summary Judgment" (document #17) be **GRANTED**; and that the Commissioner's determination be **AFFIRMED.**

## VI. NOTICE OF APPEAL RIGHTS

The parties are hereby advised that, pursuant to 28 U.S.C. §636(b)(1)(c), written objections to the proposed findings of fact and conclusions of law and the recommendation contained in this Memorandum must be filed within ten (10) days after service of same. Page v. Lee, 337 F.3d 411, 416 n.3 (4th Cir. 2003); Snyder v. Ridenour, 889 F.2d 1363, 1365 (4th Cir. 1989); United States v. Rice, 741 F. Supp. 101, 102 (W.D.N.C. 1990). Failure to file objections to this Memorandum with the district court constitutes a waiver of the right to de novo review by the district court. Diamond v. Colonial Life, 416 F.3d 310, 315-16 (4th Cir. 2005); Wells v. Shriners Hosp., 109 F.3d 198, 201 (4th Cir. 1997); Snyder, 889 F.2d at 1365. Moreover, failure to file timely objections will also preclude the parties from raising such objections on appeal. Diamond, 416 F.3d at 316; Wells, 109 F.3d at 201; Page, 337 F.3d at 416 n.3; Thomas v. Arn, 474 U.S. 140, 147 (1985); Wright v. Collins, 766 F.2d 841, 845-46 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

The Clerk is directed to send copies of this Memorandum and Recommendation to counsel for the parties; and to the Honorable Robert J. Conrad, Jr.

**SO RECOMMENDED AND ORDERED**.

Signed: June 5, 2008

Carl Horn, III
United States Magistrate Judge